IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| TALI WASHBURN,<br><br>    Plaintiff,<br><br>v.<br><br>C6-ZERO, LLC,<br>C6-ZERO IOWA, LLC,<br>C6-ZERO HOLDINGS, LLC,<br>SECOND-61, LLC,<br>ABACUS SOLUTIONS GROUP, LLC,<br>BRAND TECHNOLOGIES CORPORATION,<br>DORE LAW GROUP, LLC,<br>BRANDLICH ASSETS, LLC,<br>BRANDLICH CONSTRUCTION, LLC,<br>BRANDLICH ENERGY SOLUTIONS, LLC,<br>BRANDLICH ENERGY SOLUTIONS HOUSTON, LLC,<br>BRANDLICH ENERGY SOLUTIONS SAN ANTONIO, LLC,<br>BRANDLICH ENERGY SOLUTIONS CASPER, LLC,<br>BRANDLICH ENERGY SOLUTIONS OREGON, LLC,<br>BRANDLICH ENERGY SOLUTIONS SAN JOAQUIN,<br>BRAND TECHNOLOGIES, LLC,<br>HOWARD BRAND,<br>TIM DORE,<br>CHRISTOPHER KOEHN,<br>BUFFY KOEHN,<br>SHANE PULVER,<br>JOE LAVIGNE,<br>JOHN DOE ENTITY DEFENDANTS, and,<br>JOHN DOE DEFENDANTS<br><br>    Defendants. | Case No. 24-CV-67-LTS-KEM<br><br><br><br><br>**MOTION TO DISQUALIFY COUNSEL** |

**MOTION TO DISQUALIFY COUNSEL**

COMES NOW, Plaintiff, by and through the undersigned, and moves this Court to disqualify attorney Michael Kuehner from representing Defendants in this matter and states the following:

1

## STATEMENT OF FACTS

1. On January 11, 2023, The Iowa Department of Natural Resources filed a petition against C6-Zero Iowa, LLC; C6-Zero Holdings, LLC; and Howard Brand in Iowa state court to remedy certain environmental protection violations. See *State Ex Rel. IDNR v. C6 Zero Iowa, LLC, et al.*, Case 06481 EQCV024854 (Iowa). *See* Declaration of Tali Washburn in support of her Motion to Disqualify Counsel.

2. Michael Kuehner undertook representation of the above-named Defendants and continues to represent these parties in that matter up to and thru the present day. *Id*.

3. On February 5, 2024, Cody Blasberg filed suit against C6-Zero Iowa, LLC; Brandlich Construction, LLC; Brand Technologies, LLC; Brandlich Energy Solutions Casper, LLC; Brandlich Energy Solutions Houston, LLC; Brandlich Assets, LLC; C6-Zero Holdings, LLC; Brandlich Energy Solutions San Antonio, LLC; Brandlich Energy Solutions San Joqauin, LLC; Brandlich Energy Solutions Dallas, LLC; Brandlich Energy Solutions Oregon, LLC; C6-Zero Holdings, LLC; Howard Brand; Dylan Brand; Tim Dore; "Callie" Washburn and other defendants not immediately relevant to these proceedings for the purposes of the instant motion in Iowa state Court.[1] See *Blasberg v. C6 Zero IA, et.al.*, Case 06481 LACV025006 (Iowa). *Id*.

4. On March 26, 2024, Michael Kuehner entered a notice of appearance on behalf of all of the above-named Defendants and proceeded to represent Defendants. Mr. Kuehner's representation of the parties continues up to and through the present day. *Id*.

5. The *Blasberg* matter is a personal injury suit filed against a host of C6-Zero entities,

---

[1] "Callie Washburn" in the *Blasberg* matter is a misspelling of Plaintiff's first name: Tali. The first name "Callie" was ostensibly taken from an *Iowa Department of Natural Resources' Emergency Order* issued by IDNR on December 15, 2022, in which Plaintiff was inadvertently referred to as "Callie" in paragraphs 4 and 5 by the Director of the IDNR.

Howard Brand, Tim Dore and Tali Washburn, and others, covering a period of time during which Plaintiff was an employee of C6-Zero (March 15, 2020, through July 2022). *Id*.

6. In July 2024, Plaintiff's counsel reached out to Mr. Kuehner to ask for contact information for Howard Brand, and other defendants. *Id*.

7. At that time, Mr. Kuehner asserted he didn't know where Howard Brand was, and he also didn't offer to ask C6-Zero general counsel Tim Dore for Mr. Brand's contact information. *Id*.

8. In July 2024, when Mr. Kuehner received a copy of Plaintiff's draft lawsuit, he offered on behalf of C6 Zero to sign a tolling agreement to engage in settlement talks past the statute of limitations. *Id*.

9. At the same time, Mr. Kuehner asserted that he did not represent Tim Dore, Howard Brand, and other defendants in this case, but rather that he only represented various C6-Zero corporate entities. *Id*.

10. Because Mr. Kuehner asserted that he did not represent Tim Dore and Howard Brand, and the other defendants in this case, in their personal capacities, it was relayed to Mr. Kuehner that Washburn could not sign any tolling agreement. *Id*.

11. Washburn preferred to work toward a settlement, but because Mr. Kuehner asserted he did not represent Howard Brand, Tim Dore, or the others, in their personal capacities, and therefore could not include them in the tolling agreement, Washburn did not sign the tolling agreement and instead filed this lawsuit before the statute of limitations ran out. *Id*.

12. At the time Washburn filed this lawsuit, Mr. Kuehner represented Washburn, Tim Dore, Howard Brand and others in the *Blasberg* matter. *Id*.

13. On November 11, 2024, Mr. Kuehner entered an appearance for Tim Dore; Dore Law Group, LLC; C6-Zero, LLC; C6-Zero Iowa, LLC; and C6-Zero Holdings, LLC in this matter.

*Id*.

14. At present, Mr. Kuehner represents Washburn; Tim Dore; C6-Zero, LLC; C6-Zero Iowa, LLC; and C6-Zero Holdings, LLC, in the *Blasberg* matter and Tim Dore; C6-Zero, LLC; C6-Zero Iowa, LLC; and C6-Zero Holdings, LLC in this matter. *Id*.

15. Washburn a hold harmless agreement with C6-Zero that requires the company to hold her harmless for any and all losses or damages arising from her employment activities, plus legal representation paid for by the company, in the event she is sued in matters relating to or arising from her employment with C6-Zero. *Id*.

16. Tim Dore, acting as general counsel for C6-Zero, previously confirmed to Washburn both in writing and in a phone call with her that she has a hold harmless agreement with C6-Zero. *Id*.

17. The company has paid for Washburn's representation in the *Blasberg* matter as part of, and proof of, her hold-harmless agreement. Id.

18. Mr. Kuehner did not seek Washburn's approval to represent her in the *Blasberg* matter, but rather acted on her behalf at the instructions of C6 Zero's leadership as part of her hold-harmless agreement. *Id*.

19. Washburn not object to Mr. Kuehner's representation without first seeking her approval, because she understood his representation of her to be evidence of the company fulfilling its obligation under the hold harmless agreement. *Id*.

20. Mr. Kuehner accepted service of process and filed an answer on behalf of myself in the *Blasberg* matter in order to prevent a default judgment from being entered against Washburn. *Id*.

21. Presumably, Mr. Kuehner represented Washburn pursuant to the hold harmless

agreement and then filed a notice of appearance and answer on her behalf as a significant benefit to not only to Washburn, but also to C6-Zero and affiliated Defendants in order to prevent the possibility of a default judgment from being entered. *Id*.

22. Mr. Kuehner has not sought to have Washburn execute a conflict waiver. *Id*.

23. Washburn's counsel in this matter advised Mr. Kuehner that Washburn was not waiving the conflict of interest for him to represent Mr. Dore and the other entities she is suing, before the filing of this motion, and requested to meet and confer on the matter with no response. *Id*.

24. C6-Zero entities are obligated to continue to fund Washburn's representation in the *Blasberg* matter as part of her hold harmless agreement, and she needs this representation, as she is owed it and cannot otherwise afford it. *Id*.

25. Washburn is economically reliant upon the hold harmless agreement provided by C6-Zero. *Id*.

26. Washburn has never received a bill from Mr. Kuehner for his services in the *Blasberg* matter, because C6-Zero is obligated to pay those legal fees as part of her hold harmless agreement. *Id*.

27. Plaintiff's counsel asked Mr. Kuehner to file a motion to have Washburn dismissed from the *Blasberg* case, since at the time Blasberg filed his suit, he didn't know that I was a whistleblower and had been wrongfully terminated from the company after raising safety concerns and after hiring my own attorney in December 2021 to demand corrections of, and to protect Washburn from, what she saw was widespread malfeasance. *Id*.

## ARGUMENT AND AUTHORITIES

1. "The decision to grant or deny a motion to disqualify an attorney rests in the discretion of the [district] court." *Midwest Motor Sports v. Artic Sales, Inc.*, 347 F.3d 693, 700 (8th Cir. 2003) (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1154 (8th Cir. 1999) (internal quotations omitted and alteration in original)).

2. While motions to disqualify counsel, "should be subjected to particularly strict judicial scrutiny" *Harker v. Commr.*, 82 F.3d 806 808 (8th Cir. 1996), "doubts should be resolved in favor of disqualification." *Gross Graphics Sys., Inc. v. Man Roland Druckmaschinen Aktiengesellschaft*, et al., No. C 00-0035 MJM at 5 (N.D. Iowa May 25, 2000). In *Gross* this Court went on to observe that, "in all but a few cases [of concurrent representation] a per se rule of disqualification exists." *Id*. At 6.

3. This Court has adopted Iowa's standards of professional conduct as set forth in Chapter 32 of the Iowa Court Rules and corresponding case law. See LR 83(f)(1). The relevant Iowa disciplinary rules provide:

> Rule 32:1.7 CONFLICT OF INTEREST: CURRENT CLIENTS
>
> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) the representation is not prohibited by law;
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) each affected client gives informed consent, confirmed in writing.
> (c) In no event shall a lawyer represent both parties in dissolution of marriage proceedings.
>
> Comment
> …

[2] Resolution of a conflict of interest problem under this rule requires the lawyer to: 1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing. The clients affected under paragraph (a) include both of the clients referred to in paragraph (a)(1) and the one or more clients whose representation might be materially limited under paragraph (a)(2).

…

[4] If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b). See rule 32:1.16. Where more than one client is involved, whether the lawyer may continue to represent any of the clients is determined both by the lawyer's ability to comply with duties owed to the former client and by the lawyer's ability to represent adequately the remaining client or clients, given the lawyer's duties to the former client. See rule 32:1.9. See also comments [5] and [29].

…

Identifying Conflicts of Interest: Directly Adverse

[6] Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client. Similarly, a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest and thus may not require consent of the respective clients.

…

Prohibited Representations

[14] Ordinarily, clients may consent to representation notwithstanding a conflict. However, as indicated in paragraph (b), some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client.

[15] Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation. See rule 32:1.1 (competence) and rule 32:1.3 (diligence).

[16] Paragraph (b)(2) describes conflicts that are nonconsentable because the representation is prohibited by applicable law.

[17] Paragraph (b)(3) describes conflicts that are nonconsentable because of the institutional interest in vigorous development of each client's position when the clients are aligned directly against each other in the same litigation or other proceeding before a tribunal. Whether clients are aligned directly against each other within the meaning of this paragraph requires examination of the context of the proceeding. Paragraph (c) provides a specific example of such a nonconsentable conflict, that is, where a lawyer is asked to represent both parties in a marriage dissolution proceeding. Although this paragraph does not preclude a lawyer's multiple representation of adverse parties to a mediation (because mediation is not a proceeding before a "tribunal" under rule 32:1.0(m)), such representation may be precluded by paragraph (b)(1).

Informed Consent

[18] Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. See rule 32:1.0(e) (informed consent). The information required depends on the nature of the conflict and the nature of the risks involved. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality, and the attorney-client privilege and the advantages and risks involved. See comments [30] and [31] (effect of common representation on confidentiality).

…

Consent Confirmed in Writing

[20] Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent. See rule 32:1.0(b). See also rule 32:1.0(n) (writing includes electronic transmission). If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. See rule 32:1.0(b). The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise

questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing.

Revoking Consent

[21] A client who has given consent to a conflict may revoke the consent and, like any other client, may terminate the lawyer's representation at any time. Whether revoking consent to the client's own representation precludes the lawyer from continuing to represent other clients depends on the circumstances, including the nature of the conflict, whether the client revoked consent because of a material change in circumstances, the reasonable expectations of the other clients, and whether material detriment to the other clients or the lawyer would result.

Consent to Future Conflict

[22] Whether a lawyer may properly request a client to waive conflicts that might arise in the future is subject to the test of paragraph (b). The effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict. If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved. On the other hand, if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, such consent is more likely to be effective, particularly if, e.g., the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation. In any case, advance consent cannot be effective if the circumstances that materialize in the future are such as would make the conflict nonconsentable under paragraph (b).

Conflicts in Litigation

[23] Paragraphs (b)(3) and (c) prohibit representation of opposing parties in the same litigation, regardless of the clients' consent. On the other hand, simultaneous representation of parties whose interests in litigation may conflict, such as coplaintiffs or codefendants, is governed by paragraph (a)(2). A conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one codefendant. On the other hand, common representation of persons having similar interests in civil litigation is proper if the requirements of paragraph (b) are met.

Rule 32:1.8 CONFLICT OF INTEREST: CURRENT CLIENTS: SPECIFIC RULES

…

(b) A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these rules.

…

Comment

…

[5] Use of information relating to the representation to the disadvantage of the client violates the lawyer's duty of loyalty. Paragraph (b) applies when the information is used to benefit either the lawyer or a third person, such as another client or business associate of the lawyer. For example, if a lawyer learns that a client intends to purchase and develop several parcels of land, the lawyer may not use that information to purchase one of the parcels in competition with the client or to recommend that another client make such a purchase. The rule does not prohibit uses that do not disadvantage the client. For example, a lawyer who learns a government agency's interpretation of trade legislation during the representation of one client may properly use that information to benefit other clients. Paragraph (b) prohibits disadvantageous use of client information unless the client gives informed consent, except as permitted or required by these rules. See rules 32:1.2(d), 32:1.6, 32:1.9(c), 32:3.3, 32:4.1(b), 32:8.1, and 32:8.3.

Rule 32:1.9 DUTIES TO FORMER CLIENTS

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

…

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client, or when the information has become generally known; or
(2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

Comment

[1] After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another

client except in conformity with this rule. Under this rule, for example, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client. So also a lawyer who has prosecuted an accused person could not properly represent the accused in a subsequent civil action against the government concerning the same transaction. Nor could a lawyer who has represented multiple clients in a matter represent one of the clients against the others in the same or a substantially related matter after a dispute arose among the clients in that matter, unless all affected clients give informed consent. See comment [9]. Current and former government lawyers must
comply with this rule to the extent required by rule 32:1.11.

[2] The scope of a "matter" for purposes of this rule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client. Similar considerations can apply to the reassignment of military lawyers between defense and prosecution functions within the same military jurisdictions. The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

[3] Matters are "substantially related" for purposes of this rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce. Similarly, a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations; however, the lawyer would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent. Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

…

Rule 32:1.10 IMPUTATION OF CONFLICTS OF INTEREST: GENERAL RULE

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rule 32:1.7 or 32:1.9, unless (1) the prohibition is based on a personal interest of the disqualified lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm;

…

(c) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in rule 32:1.7.

…

Rule 32:8.5 DISCIPLINARY AUTHORITY; CHOICE OF LAW

(a) Disciplinary Authority. A lawyer admitted to practice in Iowa is subject to the disciplinary authority of Iowa, regardless of where the lawyer's conduct occurs. A lawyer not admitted in Iowa is also subject to the disciplinary authority of Iowa if the lawyer provides or offers to provide any legal services in Iowa. A lawyer may be subject to the disciplinary authority of both Iowa and another jurisdiction for the same conduct.
(b) Choice of Law. In any exercise of the disciplinary authority of Iowa, the rules of professional conduct to be applied shall be as follows:
(1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and
(2) for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct. A lawyer shall not be subject to discipline if the lawyer's conduct conforms to the rules of a jurisdiction in which the lawyer reasonably believes the predominant effect of the lawyer's conduct will occur.

4. The ABA's Model Rules of Professional Conduct as well as the ABA's Model Code of Professional Responsibility, promulgate similar rules which this Circuit recognizes carry great weight in the examination of an attorney's conduct. *Central Milk Prod. Coop v. Sentry Food Stores, Inc.*, 573 F.2d 988, 993 (8th Cir. 1978). Plaintiff incorporates by reference the ABA Rules and Code even though not fully set forth herein as that would be needlessly redundant.

5. It in undisputed that the relevant Defendants and Washburn have an attorney client relationship with Mr. Kuehner in the *Blasberg* matter.

6. It is also undisputed that Washburn has not granted permission to Mr. Kuehner to undertake representation that is adverse to her.[2]

7. The majority of circuit courts, including the Eight Circuit, have held that once the moving party establishes a substantial relationship between the attorney's current and previous relationships, there is an irrebuttable presumption that confidences have been disclosed in violation of the Rules of Professional Responsibility. *Arkansas v. Dean Foods Prods. Co.*, 605 F.2d 380, 383 (8th Cir. 1975). Adverse representation in litigation concerning a considerable period of time in which Washburn was employed by C6 Zero regarding her conduct and interactions with company leadership and outside governmental agencies certainly establishes a substantial relationship between Mr. Kuehner, the relevant Defendants and Washburn regarding matters that are substantially related.

**CONCLUSION**

In conclusion, Plaintiff requests that this Court grant the instant motion and disqualify Mr. Kuehner from serving as counsel of record for Defendants in this proceeding.

CERTIFICATE OF SERVICE

The undersigned certifies that on the 8th day of January 2025, a copy of the foregoing document was filed with the Clerk of Court for the United States Court for the Northern District of Iowa using the CM/ECF system and served electronically on those participants that receive service through the CM/ECF System in this matter.

Respectfully submitted,

---

[2] Washburn points this Court to Iowa Rule 32:1.7, Comment 6 which provides that "[l]oyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated."

/s/ Joel A. Arends

Joel A. Arends AT0012520
Arends Law, P.C.
6901 S. Lyncrest Pl., Ste. 102
Sioux Falls, SD 57108
joel@arendslaw.com
(605) 254-2624
Attorney for Plaintiff