# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

|  |  |
|---|---|
| TALI WASHBURN, | |
| Plaintiff, | No.  C24-67-LTS-KEM |
| vs. | |
| C6-ZERO, LLC, et al., | **ORDER** |
| Defendants. | |

## I.     INTRODUCTION

This matter is before me on a motion (Doc. 160) to dismiss filed by defendants Abacus Solutions Group, LLC (Abacus), Buffy Koehn, Christopher Koehn,[1] Shane Pulver and Second-61, LLC (Second-61) (collectively, the Movants).  Plaintiff Tali Washburn has filed a resistance (Doc. 168) and the Movants have filed a reply (Doc. 175).  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.     BACKGROUND

This lawsuit, which invokes the court's diversity jurisdiction under 28 U.S.C. § 1332, involves an employment dispute in which Washburn alleges she was hired by C6-Zero and was wrongfully terminated after raising concerns about safety, internal company interference with her work responsibilities, payroll, royalties, taxes and other issues. Doc. 147 at 2.  Washburn alleges that defendant C6-Zero, LLC (C6-Zero),[2] has failed to pay her full wages and other promised forms of compensation.  She alleges the following claims against all defendants:

---

[1] Throughout this order, all references to Koehn will be to Christopher Koehn.  Buffy Koehn will be referenced by her first or full name.

[2] Washburn alleges that the other defendants are alter egos of C6-Zero.  Doc. 147 at 3-4.

- Count I – wage claims under Iowa Code Chapter 91A

- Count II – breach of contract

- Count III – fraudulent misrepresentation

- Count IV – civil conspiracy

- Count V – reserved punitive damages

- Count VI – contract reformation (fraud)

- Count VII – alter ego liability

- Count VIII – joint and several liability "defendants acting in concert"

- Count VIV – quantum meruit

- Count X – unjust enrichment

*Id.* at 65-72.

### III. APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its

2

face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)). While factual plausibility is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable legal theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927, 937 (N.D. Iowa 2014).

In considering a Rule 12(b)(6) motion to dismiss, ordinarily the court "cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment." *McMahon v. Transamerica Life Ins. Co.*, No. C17-149-LTS, 2018 WL 3381406, at *2 n.2 (N.D. Iowa July 11, 2018); *see* Fed. R. Civ. P. 12(b)(6). On the other hand, when a copy of a "written instrument" is attached to a pleading, it is considered "a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, when the pleadings necessarily embrace certain documents, I may consider those documents without turning a motion to dismiss into a motion for summary judgment. *McMahon*,

2018 WL 3381406 at *2 n.2. These documents include "exhibits attached to the complaint." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead. The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within 21 days. *See* Fed. R. Civ. P. 15(a)(1)(B). Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to do so. When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am.*, 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

## IV. DISCUSSION[3]

The Movants seek dismissal of all claims against them for failure to state a claim. As defendants acknowledge, several of Washburn's claims against them turn on the issue of whether they can be liable for the actions of C6-Zero based on alter ego liability. As such, I will discuss that issue first before addressing Washburn's other claims.

---

[3] As a general note, Washburn's counsel's style of including all factual allegations in support of all claims in one section and then incorporating all of those allegations and simply listing the elements under each claim is extremely ineffective and frustrating for the court. But for Washburn's resistance, defendants and the court would be left having to guess at which factual allegations she relies on in support of each claim. With 455 factual allegations, that is extremely tedious work. Counsel for Washburn should refrain from using this style of pleading in future cases in this court.

4

**A.     *Count VII – Alter Ego Liability*[4]**

The Movants argue there can be no alter ego liability as to Buffy Koehn, Second-61 or Abacus because they are not members of C6-Zero. While Washburn has alleged Koehn and Pulver are members of C6-Zero, *see* Doc. 147 at ¶¶ 70, 358, 519, they argue Washburn has failed to allege exceptional circumstances that would establish alter ego liability. They note that individuals regularly use personal funds to capitalize companies and owners and managers regularly exercise complete control over a company. They argue the allegations of common interests among defendants also do not rise to the level of exceptional circumstances and the allegations of unity of interest and ownership also fall short of establishing a basis for alter ego liability. With regard to allegations of undercapitalization, the Movants argue Washburn relies on conclusory allegations and makes no allegations focused on the capital structure of C6-Zero at or near the time of its formation. They also contend that an allegation that C6-Zero failed to keep distinct records is not enough to establish alter ego liability and that several of Washburn's allegations demonstrate that C6-Zero was operating as a legitimate company, not as a sham to promote fraud or illegality.

Washburn argues that the court can consider undercapitalization later in an entity's existence and should consider it under the circumstances here. Doc. 168 at 20-21 (citing *Woodruff Const., LLC v. Clark*, No. 17-1422, 2018 WL 3913776, at *7 (Iowa Ct. App. 2018)). She alleges that C6-Zero was a shingle recycler and that Koehn and Pulver approved the purchase of a soybean crushing business, a change in the core business operations that led to a rapid and substantial capital depletion that led to Washburn's

---

[4] The parties rely on Iowa law and I agree that Iowa law applies. *See Tyson Fresh Meats, Inc. v. Lauer*, 918 F. Supp. 2d 835, 850-51 (N.D. Iowa 2013) (noting that "[m]ost jurisdictions recognize the internal affairs doctrine whereby 'the law of the state of incorporation' is used to determine 'issues relating to the internal affairs of a corporation.").

salary not being paid in full. Instead, Second-61 partially paid her salary and Abacus paid her health and retirement benefits.

In addition to undercapitalization, she alleges there was a commingling of funds, as Koehn and Pulver authorized corporate funds to pay for personal vehicles and housing for member Howard Brand and his family. They also allegedly authorized the purchase of a house from a city fire safety official and elected city councilor in exchange for his public support of C6-Zero locating to Marengo. She further alleges Koehn and Pulver used C6-Zero funds to pay for legal fees and fines levied against Brand personally by the state of Texas for violations of state environmental regulations that were not committed by C6-Zero. Additionally, Washburn alleges Koehn and Pulver authorized the use of $50,000 in company funds to pay off an electrician who threatened to defame Brand after C6-Zero failed to secure a written bid for his services. Finally, they permitted Brand and his family to use C6-Zero funds for travel, food, entertaining and bedding.

Washburn's alter ego claim also includes allegations that Koehn and Pulver failed to maintain separate books for C6-Zero by failing to properly document Washburn's salary, the arrears from failing to pay it and account for C6-Zero's tax obligations so that Washburn could properly file her federal tax return. She contends the partial salary payments and benefits paid by Abacus and Second-61 were not accounted for by C6-Zero. Finally, Washburn alleges that the dissolution of C6-Zero during the tenure of her employment and six months before she was wrongfully terminated demonstrates that corporate formalities were not followed and that C6-Zero was a mere sham.

As the Southern District of Iowa has recently observed, there are generally two scenarios in which the Iowa Supreme Court has recognized that piercing the corporate veil or applying alter ego liability is appropriate. *See United States v. Huyser*, 4:23-cv-144, 2024 WL 5054962, at *22 (S.D. Iowa Sept. 30, 2024). The first is when there is a unity of interest and identity between the owner and entity that the corporate entity and person cannot be separated. *Id.* The second is when the entity was formed without sufficient capital or was solely or predominantly engaged in fraudulent activity. *Id.*

6

(citing *HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 941 (8th Cir. 2007) and *C. Mac Chambers Co. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 598 (Iowa 1987)). Washburn's allegations fall primarily under the second category.

The Iowa Supreme Court has explained as follows with regard to piercing the corporate veil:

> A court may disregard a corporate structure by piercing the corporate veil only under circumstances 'where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *C. Mac Chambers Co. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 597 (Iowa 1987) (quoting *Briggs*, 262 N.W.2d at 810).

> The burden is on the party seeking to pierce the corporate veil to show the exceptional circumstances required. *C. Mac Chambers*, 412 N.W.2d at 598. Factors that would support such a finding include (1) the corporation is undercapitalized; (2) it lacks separate books; (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation; (4) the corporation is used to promote fraud or illegality; (5) corporate formalities are not followed; and (6) the corporation is a mere sham." *Id.* (citing *Briggs*, 262 N.W.2d at 810).

*In re Marriage of Ballstaedt*, 606 N.W.2d 345, 349 (Iowa 2000). This list is not exhaustive, but a guideline. *Boyd. v. Boyd & Boyd*, 386 N.W.2d 540, 544 (Iowa Ct. App. 1986). To begin, I agree that Washburn has failed to state a claim of alter ego liability as to Buffy Koehn, Second-61 or Abacus because Washburn has not alleged they are members of C6-Zero. She has alleged only that Buffy Koehn was an officer and member of Abacus, which was an investor in C6-Zero, and that Second-61 was also an investor in C6-Zero. *See* Doc. 147 at ¶¶ 71, 319. She has alleged, however, that Koehn and Pulver were members and held themselves out as owners/members. *Id.* at ¶¶ 70, 358, 497, 498, 500, 519. Because Washburn does not allege that Buffy Koehn, Second-61 nor Abacus were members/owners of C6-Zero, they cannot be personally liable for actions of C6-Zero. Therefore Count VII against them will be dismissed. *See Briggs*, 262 N.W.2d at 810 ("An abuse of the corporate privilege may justify piercing the

7

corporate veil as to persons who actively participate in the conduct of corporate affairs and have provided inadequate capitalization.").

With regard to the six factors identified by the Iowa Supreme Court, I will begin with Washburn's allegations related to undercapitalization. The Iowa Supreme Court has stated:

> If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.

*Briggs*, 262 N.W.2d at 810 (quoting Henry W. Ballantine, *Ballantine on Corporations*, § 129 (rev. ed. 1946)). Adequacy of capitalization is typically measured at the time of incorporation. *See, e.g.*, *Algreen v. Gardner*, No. 17-0104, 2018 WL 3057438, at *5 (Iowa Ct. App. June 20, 2018). Washburn argues that I may examine capitalization after formation based on *Woodruff*, in which the court stated:

> However, the corporation's initial adequate capitalization is not determinative of adequate capitalization for the remainder of the corporation's existence. A corporation may later become undercapitalized for any number of reasons. *Id.* Exceptions permitting examination of capitalization after formation might include a change in nature of the business, an inadequately-capitalized expansion, capital transfers to the controlling shareholder which renders the initial adequacy irrelevant, or losses resulting from fraudulent manipulation of the corporation. 1 Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 41.33; *see also Scott v. AZL Res., Inc.*, 753 P.2d 897, 901 (N.M. 1988). These exceptions allow courts to disregard the corporate veil where the shareholder purposely underfunds the business, while maintaining protections for a shareholder whose business has suffered legitimate financial reversals.

8

*Woodruff Construction, LLC*, 924 N.W.2d at *3.

Washburn alleges that C6-Zero was formed on February 2, 2021, but was merged with a Colorado company (which had been formed on June 4, 2020) under the same name on February 4, 2021. Doc. 147 at ¶¶ 21-22. She began working for C6-Zero in March 2020, prior to its official formation. Washburn does not directly allege anything about the capitalization of C6-Zero at the time it was formed but insinuates that it was undercapitalized by alleging that since she was hired in March 2020, she was repeatedly promised payment of her full salary but was never fully paid. *Id.* at ¶¶ 102-03, 108, 111. In January 2021, she was allegedly told that C6-Zero was still waiting for "full funding," *see id.* at ¶ 127, and in February 2021 was told the company had sufficient funds to pay the full amount of her back salary, but that the money was needed elsewhere. *Id.* at ¶¶ 136-38.

Washburn alleges that any salary payments she did receive came from sources other than C6-Zero. *Id.* at ¶ 142 (paid by Second-61 in 2020); ¶ 156 (Second-61 was financing her salary); ¶ 214 (received a $2,500 partial back salary payment from the Koehns personal joint checking account); ¶ 295 (alleging she was paid $124,500 through Second-61, the Koehns and G&A Partners for 2021); ¶ 342 (alleging she was strung along by repeated promises to pay her back salary to the personal benefit of Koehn, Buffy Koehn, Pulver, Brand, Second-61 and Abacus); ¶ 348 (alleging various promises by Koehn to pay Washburn her back salary); ¶ 397 (alleging the partial salary payments and benefits paid to Washburn by Abacus and Second-61 were not accounted for by C6-Zero). Washburn alleges that other entities and individuals were also paying for other C6-Zero's expenses. *See id.* at ¶ 156 (alleging that in March and April 2021, Koehn told Washburn that Second-61 and Abacus were paying for C6-Zero bills out of Second-61 and Abacus accounts); ¶ 202 (alleging Second-61 was providing C6-Zero's cash flow); ¶ 227 (alleging in September 2021, Koehn told Washburn Second-61 and Abacus were financially floating C6-Zero). Finally, she alleges the lack of capital due to the change

9

in core business operations (from shingle recycling to soybean crushing) was one reason why Washburn's salary was not being paid in full. *Id.* at ¶ 388.

The Movants argue the fact that C6-Zero was able to purchase the soy crushing factory demonstrates that it had sufficient capital.[5] They also cite Washburn's allegations that she raised "millions of dollars"[6] for C6-Zero as demonstrating it was adequately capitalized.

At this stage, Washburn has sufficiently alleged C6-Zero was undercapitalized, if not at the beginning, then at least later in its existence. She has alleged that C6-Zero was never able to fully pay her back salary and that any salary payments she did receive came from other individuals or entities directly. While the Movants point to allegations that C6-Zero made significant purchases, such as the soybean crushing factory, that hardly demonstrates it was sufficiently capitalized given that it was not paying Washburn and in light of Washburn's other allegations that (1) other entities and individuals were paying C6-Zero's bills and (2) that C6-Zero funds were being used to pay personal expenses of some members or expenses unrelated to C6-Zero business. *See id.* at ¶¶ 156, 202, 227, 248, 322, 336-37, 388. In other words, it is unclear whether those significant purchases were made with C6-Zero funds as opposed to funds supplied by some other entity or individual. Indeed, any allegations Washburn makes as to the amount of capital C6-Zero

---

[5] Washburn's allegations concerning this purchase include that on August 18, 2021, Koehn told Washburn that he, Brand and Pulver used over $900,000.00 to pay over five years of unpaid bills for the previous owner of the soybean crushing facility. Doc. 147 at ¶ 420. He stated this money was provided by an investor. *Id.* at ¶ 421.

[6] Defendants do not actually cite any allegations from the second amended complaint that Washburn raised "millions of dollars" for C6-Zero. From what I can tell, the closest allegations are that Brand told Washburn he could not pay her because he "spent all the money" and told her the amount invested and spent in the company was millions of dollars. Doc. 147 at ¶ 275. Washburn alleges that this acknowledgment by Brand that C6-Zero had received millions of dollars of investment was a testament to Washburn's value in finding the regulatory pathway for the patent [for shingle recycling technology] to be utilized, and also a testament to the level of fraud perpetrated against her by her employers. *Id.* at ¶ 276. There are no allegations that Washburn directly raised any amount of money for C6-Zero.

purportedly had are based on representations made to her by members of C6-Zero. These members claimed C6-Zero would make between "tens and hundreds of millions of dollars in revenue in the first year." *Id.* at ¶ 83. They also purportedly confirmed that C6-Zero had achieved the necessary level of investment by at least December 2020 to permit Washburn to receive the full $18,750 per month salary. *Id.* at ¶¶ 381-82. In November 2021, Brand purportedly told her that C6-Zero could not pay her because Brand had "spent all the money" and that the amount invested and spent in the company was millions of dollars. Doc. 147 at ¶ 275; *id.* at ¶ 425 (alleging that on November 17, 2021, Brand told Washburn the company had received over $2,500,000.00 and that "he spent it all" and thus could not pay for Washburn's salary). These same members were purportedly using or authorizing C6-Zero funds for personal expenses (detailed below). It is possible C6-Zero was sufficiently capitalized and simply chose not to pay Washburn for other reasons. At this stage, however, Washburn has plausibly alleged that C6-Zero was, and perhaps always had been, undercapitalized, in light of its failure to pay basic company expenses, including Washburn's salary, during its first year, despite members' representations that it had "millions of dollars." *See id.* at ¶¶ 136-142, 156, 202, 227.

In addition, Washburn has plausibly alleged that C6-Zero failed to maintain separate books, *id.* at ¶¶ 393, 397, and that individual obligations and expenses were paid with C6-Zero funds. *Id.* at ¶ 248 (alleging Koehn told Washburn the legal fees from Brand's legal troubles in Texas and accompanying judgment were high, leaving C6-Zero short on cash), ¶ 350 (alleging the following expenditures were made prior to full payment of Washburn's salary: a home for Brand's son (bought from the safety official in Marengo), a lake house for the Brands, out-of-state trips for the Brands, Brand's legal fees from a company that pre-dated C6-Zero, Brand's fines for violations of Texas environmental regulations, junkets for Abacus and Second-61, vacations for Brand and his family, vehicles for Brand and his family, and trips, food, entertainment and bedding for Brand and his family). She has also alleged that corporate formalities were not

11

followed, particularly with regard to payroll taxes. *Id.* at ¶¶ 295, 296, 297, 364, 366, 369, 372-73, 375, 393, 397.

Washburn has alleged facts that fit within the six factors identified by Iowa courts as sufficient to impose alter ego liability. Because she has plausibly alleged a basis for alter ego liability, I decline to dismiss this claim or theory of recovery at this time. The Movants' motion to dismiss Washburn's claim of alter ego liability is denied as to defendants Koehn and Pulver and granted as to defendants Buffy Koehn, Second-61 and Abacus for the reasons provided herein.

**B.     *Count I – Wage Claims Under Iowa Code Chapter 91A***

The Movants argue Washburn's claim under Iowa Code Chapter 91A, the Iowa Wage Payment Collection Law (IWPCL), fails to state a claim against them because the IWPCL does not encompass members, officers, directors or investors of an employer. It notes that federal law and other states' wage collection laws have extended liability to officers, managers or shareholders or persons acting in the interest of an employer, but Iowa's law does not. *See* Doc. 175 at 5-6 (citing definitions of employer in the Federal Labor Standards Act and Kansas and Illinois wage laws).

Washburn contends that the directors of C6-Zero did not use their corporate entity to fully pay Washburn all her wages and in doing so, created a hybrid payment system in which she was partially paid directly by the Movants. Washburn alleges that Koehn and Pulver were members, officers and directors of C6-Zero, that Buffy Koehn was an officer and member of Abacus and that Abacus and Second-61 were investors in C6-Zero. She also alleges that for purposes of the IWPCL, all defendants formed an employer-employee relationship with her because they conspired to use companies strictly owned and closely controlled by one another, or personal funds, to pay Washburn for her services to C6-Zero rather than depositing the funds with C6-Zero for it to then pay her. She alleges this allowed C6-Zero to avoid taking on more debt and permitted Second-61 and Abacus to claim federal employee tax deductions – which are only

12

available to employers as a result of claiming employees.[7] She contends that the Movants' actions indicate they deliberately calculated to create an employer-employee relationship between themselves and Washburn for purposes of the IWPCL.

The IWPCL provides that "[a]n employer shall pay all wages due its employees, less any lawful deductions specified in section 91A.5, at least in monthly, semimonthly, or biweekly installments on regular paydays which are at consistent intervals from each other and which are designated in advance by the employer." Iowa Code § 91A.3(1). The statute defines "employee" as "a natural person who is employed in this state for wages by an employer." Iowa Code § 91A.2(3). It does not include an independent contractor. *Id.* at § 91A.2(3)(c). An "employer" is defined as a person or entity "who in this state employs for wages a natural person." Iowa Code § 91A.2(4). Wages are "compensation owed by an employer for . . . [l]abor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation." *Andrew v. Hamilton Cnty. Pub. Hosp.*, 960 N.W.2d 481, 495 (Iowa 2021) (citing Iowa Code 91A.2(7)(a)).

Washburn alleges that C6-Zero has failed to pay her full wages in violation of the IWPCL. Doc. 147 at ¶ 15. She alleges that the Movants are alter egos of C6-Zero and liable for her wages. *Id.* at ¶ 17. As noted above, the alter ego doctrine may be used to "hold the shareholders of a corporation responsible for corporate liabilities." *Hopper v. City of Waterloo*, 977 N.W.2d 115, 2022 WL 610321, at *2 (Iowa Ct. App. Mar. 2, 2022) (quoting *Gilleard v. Nelson*, No. 03-1496, 2005 WL 2756042, at *3 (Iowa Ct. App. Oct. 26, 2005)). I have already determined that Koehn and Pulver may be responsible for the corporate liabilities of C6-Zero under the alter ego doctrine. They

---

[7] Washburn acknowledges she was issued a 1099 form by Second-61 rather than a W2 from C6-Zero for income that she earned for tax year 2021 but argues she was never a 1099 contractor and relies on the tax benefits Second-61 and Abacus received as evidence that they intended to create an employer-employee relationship. Doc. 147 at ¶¶ 369, 367-77, 396.

cannot be held liable individually except through application of that doctrine as there are no allegations that either individual employed Washburn.

Liability cannot extend to Buffy Koehn, Second-61, nor Abacus, as they are not members of C6-Zero. While Second-61 and Abacus purportedly made payments to Washburn, paid for benefits she received and/or or claimed her as an employee in a company directory or to obtain tax benefits, Washburn has not alleged that she was employed by these entities. Rather, she alleges that these entities were essentially making payments on behalf of C6-Zero by using their own resources. *See* Doc. 147 at ¶ 348 (alleging salary payments from Second-61 and the Koehns' personal account and that "Washburn's [401k] benefits were an obligation of C6-Zero, but Pulver seamlessly added Washburn to the Abacus employees group."). Washburn has cited no authority for the proposition that payment of wages on behalf of an employer creates a separate employer-employee relationship. Nor does she allege that she was employed by any entity other than C6-Zero. *See id.* at ¶ 1 ("Washburn was an employee of Defendant C6-Zero, LLC"); ¶ 15 ("In violation of [the IWPCL] . . . C6-Zero has failed to pay Washburn her full wages."); ¶ 105 (alleging to keep Washburn from leaving C6-Zero . . . , *the company* gave Washburn a Verification Letter on October 19, 2020, stating that she was hired on March 15, 2020, at an annual base salary of $225,000.00 a year.") (emphasis added). She alleges the other defendants are liable only through application of the alter ego doctrine. *Id.* at ¶ 17 ("Plaintiff, therefore, files this Complaint against Defendants, which, in addition to C6-Zero itself, are alter egos, for failure to pay her wages in violation of the IWPCL."). As discussed above, that argument applies only to Koehn and Pulver.

For these reasons, the Movants' motion as to Count I is granted, with the understanding that if C6-Zero is found to have violated the IWPCL and Washburn proves alter ego liability, Koehn and Pulver could be held personally responsible for that corporate liability.

14

### C.    Count II – Breach of Contract

The Movants argue Washburn's breach of contract claim against them must be dismissed because Washburn alleges that her employment agreement was only with C6-Zero and she has failed to identify any other contractual agreement between herself and the Movants. Similar to her wage claim under the IWPCL, Washburn alleges liability as to the Movants based on their status as members, officers, directors or investors in C6-Zero. Doc. 168 at 13. Specifically, she alleges that Koehn was the managing member of C6-Zero and, as Chief Operating Officer, had the authority to bind C6-Zero to an oral agreement with Washburn.

Washburn alleges that "Brand, Koehn and Pulver caused C6-Zero to execute the Employment Agreement with Washburn on behalf of C6-Zero. Doc. 147 at ¶ 379. Her breach of contract claim is solely based on the Employment Agreement.[8] *Id.* at ¶¶ 462-66. As such, and as with her IWPCL claim, defendants Koehn and Pulver may be held liable only as a result of alter ego liability. Washburn has failed to state a claim as to defendants Buffy Koehn, Abacus and Second-61, either individually or through alter ego liability as none of them are alleged to be members of C6-Zero. The Movants' motion as to Count II is granted, with the understanding that if Washburn is successful on her claim of alter ego liability, Koehn and Pulver could be held personally responsible for any liability of C6-Zero.

---

[8] It is unclear which "Employment Agreement" Washburn relies on for her breach of contract claim. Her second amended complaint describes two separate agreements – the first when she was hired in March 2020, which she alleges was subsequently memorialized in an April 8, 2020, Offer and Acceptance letter and an October 19, 2020, Verification Letter. *See* Doc. 147 at ¶¶ 105, 107. The second agreement she references is an oral contract she made with Koehn in May through July 2021, concerning payment of her salary and other benefits to prevent her from resigning and filing a wage claim. *Id.* at ¶ 408-411, 455. Her references to "Employment Agreement" throughout the second amended complaint do not specify to which agreement she is referring. *Id.* at ¶¶ 103, 379-80, 458, 463-66. In any event, the agreement she alleges was breached does not matter for purposes of this motion because both agreements were allegedly made with C6-Zero.

Case 1:24-cv-00067-LTS-KEM    Document 180    Filed 10/14/25    Page 15 of 27

### D. Count III – Fraudulent Misrepresentation

The Movants argue Washburn fails to state a claim of fraudulent misrepresentation because she fails to identify a false representation made to her by any of the Movants. They argue any of the allegations related to this claim are conclusory and lack factual specificity. Additionally, they argue she fails to allege an intent to deceive by any of the Movants.

Washburn argues she adequately pleaded Koehn's and Pulver's intention not to pay her salary by alleging various promises to pay her salary and numerous failures to perform. She argues that their repeated representations followed by their repeated failures to perform while spending her salary on other goods and services for company and non-company matters meets the particularity requirements of Federal Rule of Civil Procedure 9(b).

To establish fraudulent misrepresentation under Iowa law, a plaintiff must establish each of the following elements:

(1) the defendant made a representation to the plaintiff,

(2) the representation was false,

(3) the representation was material,

(4) the defendant knew the representation was false,

(5) the defendant intended to deceive the plaintiff,

(6) the plaintiff justifiably relied on the truth of the representation,

(7) the representation was the proximate cause of the plaintiff's damages, and

(8) the amount of damages.

*Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012). "Fraudulent misrepresentation is an 'intentional' tort, meaning that it is committed by a party acting with a mental state intending to commit the act in question." *Mehmedovic v. Tyson Foods Inc.*, 21 N.W.3d 412, 426 (Iowa 2025).

Washburn's second amended complaint contains no details as to which alleged representations, by which defendants, she is relying on for her fraudulent

16

misrepresentation claim. She states only that "[d]efendants made representations to Washburn," "[t]he representations made to Washburn were false," and other conclusory allegations that merely state the elements of the claim. Doc. 147 at ¶¶ 467-75. In her resistance, she identifies paragraphs 16, 348-50 and 408 as containing the "repeated and exhaustive representations" that she would be paid. Paragraphs 16 and 408 relate to an alleged oral contract between Washburn and Koehn regarding payment of her back salary and other payments that were offered to prevent Washburn from resigning. Paragraphs 348 through 350 detail various communications with Koehn from December 2020 through December 2021 concerning payment of her back salary and other expenses to which C6-Zero funds were diverted. She alleges that Pulver and Buffy Koehn had knowledge of these expenditures.

Based on the context of Washburn's allegations, she alleges that any representation made by Koehn was made on behalf of C6-Zero. *See id.* at ¶ 16 ("To prevent Washburn from quitting due to C6-Zero's ongoing failure to pay her full salary, *company officials* promised to pay Washburn all of her back salary . . . .") (emphasis added). The same is true for representations alleged in paragraph 348. To the extent she alleges that Koehn made any fraudulent misrepresentations to Washburn in his individual capacity, she has not adequately identified any such representations for me to evaluate, either in her second amended complaint or her resistance.[9] The context of Washburn's allegations and arguments suggests that any claim of fraudulent misrepresentation is directed at C6-Zero through Koehn acting as an agent, not at Koehn individually.

As to other defendants, Washburn does not allege any specific representations made by Buffy Koehn, Pulver or agents acting on behalf of Second-61 or Abacus. While she generally alleges that Pulver, among others, promised to pay and provide benefits to Washburn, *id.* at ¶ 383, this allegation lacks the specificity necessary for a claim of

---

[9] Paragraph 348 contains 41 separate paragraphs detailing communications Washburn had with Koehn.

fraudulent misrepresentation under Rule 9(b)[10] and again, is based on his capacity as an agent for C6-Zero.  As such, I find Washburn has not stated a claim of fraudulent misrepresentation as to any of the Movants.  This claim will be dismissed.

### E.    Count IV – Civil Conspiracy

The Movants argue civil conspiracy is not actionable under Iowa law but essentially a method for imposing joint and several liability on actors who committed a tortious act in furtherance of the conspiracy.  They argue Washburn has failed to identify which of the named defendants was engaged in civil conspiracy and presents only conclusory allegations about liability.  Finally, they argue her claim of alter ego liability is contradictory to a claim of civil conspiracy.

Washburn relies on allegations that Brand, Koehn and Pulver were members of C6-Zero, that Brand and Pulver approved of Koehn's oral agreement with Washburn, that the Movants breached the oral agreement and that there was an agreement or understanding by Brand, Koehn and Pulver to breach the oral agreement.  Finally, she contends she has sufficiently alleged civil conspiracy by virtue of aiding and abetting.

Under Iowa law, "[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful." *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 172 (Iowa 2002) (citing *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977)).  "Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action." *Id*.  "Thus,

---

[10] Requiring that in alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  This means a plaintiff must allege "the time, place and contends of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Commercial Prop. Inv., Inc. v. Quality Inns Int'l*, 61 F.3d 639, 644 (8th Cir. 1995) (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982)).

conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert." *Id.* Iowa courts have recognized a breach of contract claim as the underlying action to a claim of civil conspiracy. *See All Energy Corp. v. Energetix, LLC*, 985 F. Supp. 2d 974, 994 n.10 (S.D. Iowa 2012) (citing cases).

Washburn relies on Koehn's alleged oral agreement with Washburn, as well as Brand and Pulver's approval of this agreement and their agreement or understanding to breach the oral employment agreement. She relies on the following allegations:[11]

- "On April 13, 2021, Koehn discussed with Washburn the possibility of Koehn and Pulver taking out a loan to pay Washburn's back salary and in doing so acknowledged they were obligated to repay it." Doc. 147 at ¶ 444.

- "Washburn offered to pay the interest on the loan if they did it at that time." *Id.* at 445.

- "Koehn said he wouldn't want Washburn to need to pay any interest or lose any money on Washburn's back salary and never said it wasn't his or Shane's obligation to resolve." *Id.* at ¶ 446.

- "On April 22, 2021, Koehn sent Washburn a text saying the money to pay her back salary was in his, Pulver's and Brand's account but that he got too busy to send it to her and would send the wire the next day. The wire never arrived." *Id.* at ¶ 447.

- "Washburn spoke with Pulver on November 19, 2021, to tell him she was going to sue him and Abacus over her missing back salary and Pulver asked her to hold off until he could work something out with Koehn and Brand." *Id.* at ¶ 448.

- "Pulver acknowledged Washburn was owed the money, never said he didn't owe it, and just asked for more time to resolve the matter before Washburn acted." *Id.* at ¶ 449.

---

[11] These allegations come from Washburn's resistance rather than her second amended complaint, which merely sets forth the elements of the claim. *See* Doc. 147 at ¶¶ 476-80. Additionally, she cites paragraphs that are not even in her second amended complaint. Doc. 168 at 16 (citing Doc. 147 at ¶¶ 533-540). *See* Doc. 147 at 72 (numbered allegations ending at ¶ 531).

19

- "On a November 19, 2021, call with Brand, Washburn threatened to sue 'Howard and Chris and Shane and Joe Lavigne' over the compensation and royalty and other issues." *Id.* at ¶ 450.

- "In that same call Brand first tried to say Washburn didn't technically work for C6-Zero." *Id.* at ¶ 451.

- "In that same call Brand attempted to assert that Washburn was paid by Second-61 and Abacus on corporate side for her salary and thus not [sic] a C6-Zero employee." *Id.* at ¶ 452.

- "Washburn pushed back that she did work for C6-Zero and that she had employment confirmation letters and pay from C6-Zero's operating accounts." *Id.* at ¶ 453.

- "Brand groaned and then backtracked. During the call Brand did not disagree that Koehn, Brand and Pulver were all liable and rather states that he would get to Dore to get Washburn something in writing before Thanksgiving 2021 regarding the oral agreement between Washburn and Brand." *Id.* at ¶ 454.

- "Dore got back to Washburn with a confirmation letter of the oral agreement between her and Koehn although it was missing a couple of items." *Id.* at ¶ 455.

*See* Doc. 168 at 16. Aside from the fact that many of these allegations relate to Brand rather than any of the Movants, the context of these allegations is that Koehn and Pulver were acting, either together or separately, on behalf of C6-Zero. This does not amount to a conspiracy as it involves one entity. I agree with the Movants that it is difficult to reconcile Washburn's claim of alter ego liability with a claim of civil conspiracy, but Federal Rule of Civil Procedure 8(d) allows a party to state as many claims as it has regardless of consistency.

While I have not found alter ego liability as to Buffy Koehn, Abacus or Second-61, Washburn alleges generally that these defendants worked in concert to direct Washburn's employment activities and operate the employment relationship in which

Washburn would receive partial payment of her salary from C6-Zero, Second-61 and the Koehns. Doc. 147 at ¶ 360-61. These allegations are conclusory and, in any event, do not establish any knowledge by Buffy Koehn, Second-61, nor Abacus that would be sufficient to show that they conspired to breach, or aided and abetted the breach, of the oral agreement Washburn allegedly made with Koehn/C6-Zero. Washburn has failed to state a claim of civil conspiracy against the Movants.

## F.    Count V – Punitive Damages

The Movants argue that punitive damages are not a distinct cause of action and Washburn has not identified any intentional tort that was committed with willful and wanton disregard for the rights of another sufficient to allow for punitive damages. To the extent she has made such allegations, the Movants argue they are conclusory and lack specific facts.

Washburn states her claim of punitive damages is based on the Movants knowingly denying Washburn her full monthly salary and disregarding their duty to pay her while paying for other goods and services and non-company related expenses. She contends this refusal to pay constitutes willful and wanton disregard for her rights. She also notes that Iowa law prohibits an employee from being terminated during any period in which her wages remain unpaid and that Koehn and Pulver participated in the decision to wrongfully terminate Washburn's employment in July 2022.

"[P]unitive damages do not constitute a distinct 'cause of action.' Rather, they are a form of relief incidental to the main cause of action." *In re Est. of Vajgrt*, 801 N.W.2d 570, 574 (Iowa 2011). Punitive damages may be awarded if the plaintiff establishes by a preponderance of clear and convincing evidence that a defendant acted with "willful and wanton disregard for the rights or safety" of others. Iowa Code § 668A.1. The Iowa Supreme Court has defined "willful and wanton" to mean that the defendant "has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would

21

follow, and which is usually accompanied by a conscious indifference to the consequences." *Mercer v. Pittway Corp.*, 616 N.W.2d 602, 617 (Iowa 2000) (quoting *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990)). "Punitive damages may be awarded in an action for fraud when, in conjunction with the fraud, the defendant acts with legal malice or engages in other aggravating conduct amounting to actual malice." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 745 (Iowa 2009).

Washburn relies on her allegations in paragraphs 348-350 detailing numerous communications with Koehn from December 2020 through December 2021, in which he made several assurances that Washburn would receive her backpay and various excuses as to why she was not paid. These allegations also detail other goods and services and non-company related expenses that C6-Zero purchased instead of paying her salary. Finally, she references allegations suggesting that her employment was wrongfully terminated for threatening a lawsuit to recover her unpaid wages. *Id.* at ¶¶ 305-06, 309, 341-44, 348-50, 360-61.

Once again, these allegations are focused on C6-Zero or conduct by various defendants acting as agents for C6-Zero. She has not stated a plausible claim for punitive damages against any of the Movants, as she has not demonstrated an underlying claim against any of these defendants that would warrant punitive damages. While Koehn and Pulver could be subject to alter ego liability if Washburn is successful on that claim, that also depends on the success of her claim(s) against C6-Zero. The Movants are entitled to dismissal of Count V.

## G.     *Count VI – Contract Reformation*

The Movants argue contract reformation is appropriate only when a contractual instrument exists and a party seeks reformation of that instrument because it does not express the true intent of the parties. Because none of the Movants entered into a contract with Washburn, they argue this claim must be dismissed against them. They also note

that Washburn never alleges that she had a written contract that failed to reflect the true intent of the parties.

Washburn states this claim is based on her alleged oral agreement with Koehn that purportedly incorporated the terms of her original employment offer and new terms that were discussed and agreed to through various phone calls and emails. She asserts that while Koehn agreed to memorialize the agreement and Dore sent her a proposed writing, that writing left out several points and therefore, the parties never memorialized the agreement. She argues that C6-Zero and its representatives "never intended to pay Washburn her full salary and benefits as evidence by their repeated failure to actually pay her, and instead they placed her on administrative leave in January 2022 after she hired her own attorney to assist in memorializing the agreement." Doc. 168 at 18. She contends Koehn's new offer was simply a way to induce her to continue working and dissuade her from bringing a wage collection action. She relies on a December 2021 payment of $18,750.00 (less misallocated tax deductions) as evidence of the agreement. In the alternative, she argues that if Koehn and the company's conduct is not determined to be fraudulent, the court should determine the conduct to be inequitable and still permit reformation.

Washburn does not allege that her oral contract was with Koehn individually, but that Koehn acted on behalf of C6-Zero. *See* Doc. 147 at ¶¶ 408-411. As such, her claim of contract reformation is properly directed against C6-Zero, not the Movants. Of course, members of C6-Zero may be held personally liable through the application of the alter ego doctrine (if successfully proven), but this claim will be dismissed against them individually, as well as against the other Movants.

## H.    Count VIII – Joint and Several Liability

The Movants argue that the analysis for joint and several liability is identical to Washburn's claim for civil conspiracy and that joint and several liability does not apply to her employment or contract claims because it applies only when two or more

23

tortfeasors' actions combine to cause a plaintiff's injuries. In her resistance, Washburn cites only Iowa law related to joint and several liability. She makes no argument as to why it applies to her case and she fails to cite any allegations of her second amended complaint in support.

Washburn does not have any surviving tort claims against any of the Movants. For the same reasons that her claim of civil conspiracy fails, Washburn's claim of alter ego liability is inconsistent with a claim of joint and several liability as to Koehn and Pulver. With regard to the other defendants, she has failed to allege that they had knowledge of the representations Koehn made to Washburn such that they could be held jointly and severally liable for any fraudulent misrepresentations by agents of C6-Zero. As such, Count VIII is dismissed against the Movants.

## I.      *Count IX – Quantum Meruit*

The Movants argue that this implied-in-contract claim is similar to Washburn's breach of contract claim and applies only to C6-Zero, not to any of the Movants. Washburn relies on the allegations in support of her IWPCL and breach of contract claims in support.

For similar reasons to her breach of contract claim, I agree with the Movants that the quantum meruit claim is properly directed against C6-Zero, not any of the Movants. As such, this claim is dismissed against the Movants with the understanding that Koehn or Pulver could be held personally liable through application of the alter ego doctrine if successfully proven.

## J.      *Count X – Unjust Enrichment*

The Movants argue that as an employee of C6-Zero, Washburn's services enriched only C6-Zero and not any of the Movants. They contend that none of her allegations demonstrate any funds flowed from C6-Zero to any of the Movants. They also argue she has failed to identify unjust circumstances perpetrated by the Movants, noting that in

24

support of her claim, she alleges only that as an investor, Joe Lavigne "exercised control over C6-Zero to the extent that he controlled operations and decision-making regarding Washburn's salary." Doc. 160-1 at 31 (citing Doc. 147 at ¶ 526). As such, they argue that this claim should be dismissed against them.

Washburn argues Koehn and Pulver admitted she was entitled to her full salary and benefits on several occasions. She alleges these defendants exercised control over C6-Zero and thus, had control over Washburn's salary and that they were enriched by maintaining possession of her unpaid salary, which they used to pay for other goods and services and non-company related expenses. She contends Koehn (and Brand) recognized the value she was providing to C6-Zero by making her additional promises in exchange for holding off on a wage claim. These included an ownership interest in the company from which she would receive royalties, additional investment opportunities and a share of profits.

"The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation." *State ex rel. Palmer v. Unisys. Corp.*, 637 N.W.2d 142, 154 (Iowa 2001). A claim of unjust enrichment under Iowa law is comprised of the following three elements: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *Id.* at 154-55.

As noted above, Washburn alleges that her employment agreement was with C6-Zero and that C6-Zero owed her salary. While she alleges that Koehn and Pulver exercised control over C6-Zero, she does not allege that they, personally, were enriched by failing to pay her salary. She cites allegations that when she asked Koehn for her back salary, he cited Buffy Koehn as the reason he could not pay it, including that they needed to go to Disney World or else Buffy would divorce him. Doc. 147 at ¶¶ 328-332. During this time (December 2022), Washburn alleges that Koehn told her that he

and Buffy Koehn were personally funding C6-Zero including cashing out their children's college funds to pay for C6-Zero expenses.  *Id.* at ¶ 322.

The Koehns' decision to stop paying expenses of C6-Zero (including Washburn's salary) from their personal funds cannot be said to result in an unjust enrichment to them by Washburn's continued work for C6-Zero, particularly because Washburn has not alleged that they were obligated to make such payments in the first place.  Washburn also relies on allegations that in summer 2021, Koehn told her he could not send more of her back salary because Buffy Koehn and Pulver needed the money for Second-61 and Abacus to wine and dine military leaders in Alaska on an all-expenses paid trip.  *Id.* at ¶¶ 336-38.  She does not allege that C6-Zero funds were used for this trip.  Indeed, based on her other allegations that the Koehns, Second-61 and Abacus were floating C6-Zero, *see id.* at ¶ 348, it could be inferred that they were putting those funds towards the Alaska trip rather than C6-Zero expenses.

Again, Washburn's continued work for C6-Zero without full payment of her salary did not result in an unjust enrichment to any of the Movants.  To the extent she relies on spending towards non-company expenses rather than her salary, those appear to be primarily related to Brand and his family.  *See id.* at ¶ 350 (alleging Brand, Koehn, Pulver and Dore had knowledge of purchasing a house from a safety official in Marengo, Iowa, for Brand's son; funding a lake house for Brand and his wife; trips for Brand and his wife; paying Brand's legal fees from a company that pre-dated C6-Zero; paying Brand's fines for violations of Texas environmental regulations; vacation for Brand and his family; vehicles for Brand and his family; trips, food, entertainment and bedding for Brand and his family; and a hush money payment to an electrician who threatened to defame Brand).  While Washburn alleges that some C6-Zero funds were spent on junkets for Abacus and Second-61, *id.*, her allegations fail to establish that her work without full pay for C6-Zero was unjustly enriching Abacus and Second-61.  Washburn's continued work for C6-Zero without payment of her full salary establishes only an unjust enrichment to C6-Zero, regardless of what it does with its funds.

26

While Koehn and Pulver may have been unjustly enriched through application of the alter ego doctrine, they were not directly unjustly enriched by Washburn's continued work for C6-Zero without payment of her full salary. Washburn has not pointed to any allegations that she performed work directly for any of the Movants such that they received a benefit at Washburn's expense. As such, Count X is dismissed against the Movants with the understanding that Koehn and Pulver could be held personally liable for any unjust enrichment to C6-Zero through application of the alter ego doctrine if successfully proven.

## V. CONCLUSION

For the reasons stated herein, the motion (Doc. 160) to dismiss filed by defendants Abacus Solutions Group, LLC, Buffy Koehn, Christopher Koehn, Shane Pulver and Second-61, LLC, is **granted in part** and **denied in part.** It is **granted** as to all of the Movants as to Counts I-VI and VIII-X. With regard to Count VII, it is **granted** as to defendants Abacus, Buffy Koehn and Second-61 and **denied** as to defendants Koehn and Pulver.

**IT IS SO ORDERED** this 14th day of October, 2025.

_____
Leonard T. Strand
United States District Judge